UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Kevin J. Grant and Dayna J. Grant,<br><br>Plaintiffs,<br><br>v.<br><br>State Farm Fire and Casualty Company,<br><br>Defendant. | Case No. 3:21-cv-00055-wmc<br><br>**KEVIN J. GRANT AND DAYNA J. GRANT'S MEMORANDUM OF LAW IN OPPOSITION TO STATE FARM FIRE AND CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT** |

## **INTRODUCTION**

Plaintiffs, Kevin J. Grant, and Dayna J. Grant, (hereinafter "Kevin" and "Dayna" jointly "the Grants"), submit this memorandum of law in opposition to Defendant's, State Farm Fire and Casualty Company (hereinafter "State Farm"), motion for summary judgment on all of Plaintiffs' claims, including their claim for 1) breach of contract, 2) insurer bad faith, and 3) negligence. This litigation arises out of an insurance claim after a fire located at 105 River Street, Woodville, WI, (the "Property") on December 29, 2018 (the "Fire").

## **FACTS**

On December 29, 2018, a fire occurred on the real property located at 105 River Street, Woodville, Wisconsin ("the property"), owned by the Grants. (Defendant's Proposed Findings of Fact ("Def.'s PFF") ¶ 1). At that time, the property was insured by State Farm. (Def.'s PFF ¶ 2). On December 29, 2018,

the policy provided coverages for debris removal, loss of income and extra expenses. (Def.'s PFF ¶ 3).

The debris removal clause of the policy provides [Policy Language]. [notice requirement]

On December 29, 2018, a fire occurred on the property, and caused severe damages. (Def.'s PFF ¶ 6). The Grants promptly filed a claim for their loss with State Farm. (Def.'s PFF ¶ 9). State Farm then opened an extensive investigation into the fire and the Grant's claim, including taking recorded statements from both Kevin and Dayna on January 18, 2019. (Def.'s PFF ¶¶ 10, 15). State Farm then proceeded by issuing a Reservation of Rights letter on January 29, 2019, and continuing its investigation on the Grants' claim. (Def.'s PFF ¶ 16). On May 29, 2019, State Farm finally made a payment of $2,500 for the Grants coverage of their Fire Department Service Charge, but still left most of the Grants' claims pending. (Def.'s PFF ¶ 21). State Farm proceeded to submit the Grants to examinations under oath on March 18, 2020, but still did not make any further payments or denials on the Grants claims for several months. (Def.'s PFF ¶ 23). On October 2, 2020, nearly two years after the fire, State Farm finally issues policy limits for Coverage A in the amount of $568,044.00 and $390.67 for twelve months of loss of income, a valuation solely calculated by State Farm. (Def.'s PFF ¶ 27, 29). On November 5, 2020, State farm also paid the Grants $14,792.03 on their coverage B claim, but then proceeded to leave all of the Grants' other claims

open. (Def.'s PFF ¶ 30). At the time of the fire, the Grants cooperated fully with the investigation

As a result of State Farm's unprecedented delay in making a determination on their claim, the Grants were forced to commence an action alleging breach of policy contract, bad faith, and negligence against State Farm. This action was filed on December 23, 2020. (Def.'s PFF ¶ 31).

## **SUMMARY JUDGMENT STANDARD**

Summary judgment shall only be appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard clearly provides, by its very terms, that the existence of any genuine issue of material fact between the parties will preclude the entry of summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). Moreover, Fed. R. Civ. P. 56(c)(1) indicates:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

To show that summary judgment is inappropriate, the nonmoving party must simply show that there is sufficient evidence for a reasonable jury to return a verdict in his or her favor. *Id.* citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968). Furthermore, "(o)n summary judgment the inferences to be drawn from the underlying facts contained in (the moving party's) materials must be viewed in the light most favorable to the party opposing the motion." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970) citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## ARGUMENT

### I. When the Fifth Amendment Privilege is Invoked in Civil Suits, the Court is not Obligated to Draw an Adverse Inference.

Taking refuge in the Fifth Amendment is not illegal or fraudulent. Courts in Wisconsin have long recognized that a party may invoke his or her Fifth Amendment rights in a civil matter in order to protect himself or herself from the use of such evidence in a related criminal action. Summary Judgment is not meant to be a short cut at the expense of a fair trial to obtain quick relief, neither is it an absolute right. *Grognet v. Fox Valley Trucking Serv.*, 45 Wis. 2d 235, 240, 172 N.W.2d 812, 815 (1969). Civil cases are indeed distinguished from criminal cases in that the Court, as a matter of law, may choose to draw an adverse inference from a party's invocation of his or her invocation rights; however, the

granting of summary judgment based thereon is not mandatory, and Courts frequently prefer to proceed with litigation in order to hear all relevant facts at trial. *Id.*

State Farm argues that a blanket invocation of the Fifth Amendment is not proper, and cites *Martin-Trigona v. Gouletas*, 634 F.2d 354, 360 (7th Cir. 1980), which states "Some nexus between the risk of criminal conviction and the information requested must exist."[1] The instant facts are that the Grants currently face a real and imminent danger of incrimination. A fire occurred on their property, a criminal action against Kevin is pending in direct relation to that fire, and that fire is directly related to the instant civil action.

Those deposition questions for which the Grants invoked their Fifth Amendment rights were directly related to the fire that took place on December 29, 2018. The Grant's did not conduct blanket invocations of their Fifth Amendment privileges throughout the duration of their depositions. Rather, they listened carefully to the questioned and invoked their Fifth Amendment privilege whenever an answer might be used as a form of self-incrimination in any related criminal proceedings. Specifically, they invoked their Fifth Amendment privilege whenever the questioning related to the fire itself or any related financial information that might pose a danger of self-incrimination.

---

[1] State Farm contradicts itself in its arguments by first drawing attention to Kevin's upcoming arraignment hearing and then claiming the Grants' invocations of their Fifth Amendment rights were improper due to a lack of risk of self-incrimination from answering relevant deposition questions.

Indeed, the Grants did not refuse their depositions or invoke their Fifth Amendment rights throughout, but rather they voluntarily answered every question asked of them that did not pose a risk of self-incrimination. Furthermore, it is inappropriate for State Farm to request adverse interest based upon the Grants' invocation of their Fifth Amendment privileges during discovery. State Farm had every opportunity to object to their invocations, yet never made any objections thereupon. Moreover, State farm had every right to seek order from the Court to compel the waiver of those privileges in order to proceed with its fact-finding endeavors, yet never made any such of the court. If State Farm was concerned with the Grants' actions during their depositions, it sought none of the myriad of remedies available.[2]

Additionally, State Farm could have, at any point in its investigation, denied the Grants claim if it believed that fraud had occurred. This is not a case where State Farm failed to make a determination on the legitimacy of a policyholder's claim. State Farm conducted an extensive investigation into the Grants' claim and went on to determine that the damages from the fire were covered under its policies when it issued payments on the claim. However, State farm proceeded to fail to timely pay all already approved amounts owed under all coverages in the Grants' claim.

---

[2] The discovery cutoff in the instant matter is February 1, 2022. If State Farm is interested in pursuing a finding of fact related to the Grant's Fifth Amendment invocations, it is welcome to seek a related determination from the Court.

## II. Plaintiffs Breach of Contract Claim Succeeds Because State Farm Failed to Pay the Full Amount Covered in the Policy Despite Plaintiffs' Providing Appropriate Evidence of the Loss
### a. Personal Property

State Farm proposes that the Grants have no personal property claim because the policy listed their Coverage B limits at $10,968.00 at the time the claim arose. (Def.'s PFF ¶ 5). State Farm alleges that any prior policy limits are irrelevant to a breach of contract claim, and that the only relevant policy limits are the policy limits at the time the claim arises. However, in this matter the former policy limits are directly relevant to the breach of contract claim itself, and the breach stems from a unilateral change to the policy terms without the statutorily required notice. When such a breach of contract occurs, the insurer is statutorily obligated to uphold the prior terms of the contract for at least a period of time equivalent to the expiring term. (See Section IV, *Infra*). As State Farm breached its duty to timely notify the Grants of the significant reduction to their coverage limits, The Grants were entitled to the limits of their former policy at the time the claim arose.

Wisconsin Courts have also already determined that if the terms of an insurance policy are ambiguous, they "should be construed against the insurance company that drafted the policy [. . .] in favor of coverage." Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶ 19, 257 Wis. 2d 80, 91, 654 N.W.2d 225, 230. Moreover, policy language is supposed to be construed according to the understanding of a reasonable person rather than in accordance with the intent of the insurer.

While the policy's property schedule lists the limits of insurance as "Coverage B – Business Personal Property $10,700 [. . .] Seasonal Increase – Business Personal Property 25%", the declarations state that there is a $100,000 coverage limit for Newly Acquired Business Personal Property when "the policy provides Coverage B – Business Personal Property" (Def.'s Ex. A. pp. 2, 4). Even if the former policy limits were no longer applicable, a reasonable person could easily interpret this to mean that the Grants had at least $100,000 in personal property coverage, or at least assumed that up to $100,000 coverage was applicable to any newly purchased personal property from a plain reading of the terms. State Farm's claim that it paid out the full policy limits of its insurance contract with the Grants fails as a matter of law because it breached its contract and the relevant policy limits are ambiguous.

b. **Debris Removal**

There is also significant ambiguity in the language of the debris removal clause of the policy. The exact language of the debris removal clause at hand provides, "[t]he expenses will be paid only if they are reported to us in writing within 180 days of the date of accidental direct physical loss." (Def.'s Ex. A. p. 47) State Farm has interpreted this language as a requirement that the Grants provide a quote or estimate related to the total cost of the debris removal within this 180-day period.

State Farm contends that the Grants are ineligible for coverage under the policy's debris removal language. As a result, State Farm has refused, thus far,

to make any payments corresponding to this coverage. State Farm does not deny the existence of the coverage under the policy, but instead claims that the Grants failed to meet the reporting standards of the coverage. This is an incorrect reading of the policy. The word "report" in the debris removal clause is ambiguous as a matter of law. A reasonable person could interpret the meaning of "report" as making the policyholder aware that such extensive damage exists in a claim that it would require debris removal.

Under this plain, reasonable reading of the ambiguous clause, the Grants, completed this reporting duty well before the 180-day period. They not only reported the claim to State Farm promptly, but also, by State Farm's own admission, allowed State Farm to conduct its own investigation into the damage in a timely manner. Throughout the claims process, State Farm had firsthand knowledge of the extensive fire damage that occurred and had actual notice from the Grants that significant debris removal would be required in order to restore the property. Therefore, State Farm's claim that the Grants did not meet the reporting standards to be eligible for debris removal coverage fails as a matter of law.

### c. Interruption of Income and Extra Expenses

The policy provides coverage for the "actual loss of income" the Grants sustained due to the necessary suspension of their operations during the period of restoration. (Def.'s Ex. A. p. 16). The building in question is a business property with three separate business areas, a restaurant/bar, a hair salon, and

a dance facility. Of these different facilities, at the time of the fire, the kitchen space of the restaurant/bar had a signed lease for a rental term to be initiated in January of 2019, the hair salon was operated by Dayna, and the dance studio was vacant and ready for use. (Def.'s Ex. 1. 99:2-23; Def.'s Ex. 2. 35:18-20; Pls.' Ex. A). State Farm calculated twelve (12) months of loss of income for two occupied business spaces and one move-in-ready space at only $390.67. State Farm calculated this estimated loss on its own metric and paid this amount to the Grants on October 8, 2020. The Grants have a claim for interruption of income coverages against State Farm as no reasonable person would ever deem $390.67 to be an accurate reflection of the actual loss of income for an operational business property in which one space was fully operational, and another space had a contracted tenant about to move in.

During discovery, the Grants provided State Farm with business work product material that shows the Grants intended to lease the kitchen area of the restaurant/Bar for $500 per month along with the option to use the restaurant area for "pop up" events at an additional cost. (Pls.' Ex. A). This agreement alone would make the minimum actual loss of income the Grants were eligible for $6,000. The Grants have determined their actual loss of income from the inability to use their property during the restoration period to be $28,700. there is a dispute of facts between State Farm and the Grants regarding the actual loss of income resulting from the claim.

The Grants have already taken steps to provide work product showcasing this loss of income and have provided documentation to State Farm that shows its calculation of actual loss was significantly miscalculated. Furthermore, the discovery period in this matter is still ongoing, and State Farm is not barred from seeking specific information regarding these losses.

In addition to the lost income arising out of the claim, the Grants incurred significant extra expenses in the mitigation of their loss. As Dayna's hair salon was located at the relevant property, the Grants were forced to seek an alternate rental facility in which she could run her business.

The Policy defines "Extra Expense" as expenses incurred to "avoid or minimize the 'suspension' of business and to continue 'operations'…to the extent it reduces the amount of loss that would otherwise be payable under this coverage or 'Loss of Income' coverage." (PFF ¶ 3). By renting an alternate facility in which to operate Dayna's hair salon. Furthermore, the policy requires the Grants to "[r]esume all or part of [their] business activities at the described premises as quickly as possible" (Def.'s Ex. A. p. 24). In renting an alternate facility so that Dayna could resume normal business operations as soon as possible, the Grants did exactly that.

State Farm argues that as it has already paid out $390.67 toward loss of income, that this amount equates to 12 months of actual loss, and that there is no further coverage for extra expense as a result of this payment. As shown

above, the Grants have provided that this payment was an unreasonably gross miscalculation of their actual loss of income for the covered twelve-month period.

State Farm, having full notice of the above-mentioned rental revenue and business operations on the property, has no reasonable argument for why it so significantly undervalued the loss of income and extra expenses for a twelve-month period. Even without any documentation of the actual loss of income and extra expenses incurred by the Grants. Moreover, State Farm has provided no evidence regarding how this calculation was made.

### III. Bad Faith Claim as a Matter of Law

#### a. State Farm Breached the Policy Contract

Summary judgment in favor of the insurer on a bad faith claim is inappropriate where an insured pleads facts and presents "some evidence" that the insurance company unreasonably denied his claim. See, e.g., *Ullerich v. Sentry Ins.*, 2012 WI App 127, ¶ 24, 344 Wis. 2d 708, 721, 824 N.W.2d 876, 883¶. The insured must plead some facts that, if proven, would demonstrate a breach of contract and a lack of reasonable basis for doing so. *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 78, 334 Wis. 2d 23, 55, 798 N.W.2d 467, 484.

Typically, when a breach of contract is being debated in a Court of Law, the subject facts are related to an unreasonable denial of a plaintiffs claim. In this matter, the facts clearly show that State Farm instead elected approve the Grants' claim, and then proceed to pay out some of the Grants' contracted

coverages while either significantly undervaluing or outright refusing to pay out others. In effect, State Farm has acted in a way that resulted in a reckless and unfounded, defacto partial-denial of the Grants' claims for personal property, debris removal, loss of income, and extra expense. (See Section II, *Supra*). State Farm's claim that it did not act in bad faith in its adjustment of the Grants' claim, therefore, fails as a matter of law.

### b. State Farm's Adjustment of the Claim was not Objectively Reasonable

The appropriate test for an insurer's conduct in adjusting such bad faith claims is whether a reasonable insurer, under the particular facts and circumstances, would have denied or delayed payment of the claim. *Poling v. Wisconsin Physicians Serv.*, 120 Wis.2d 603, 608, 357 N.W.2d 293 (Ct. App. 1984). Here it is clear that a reasonable insurer, upon electing to approve the claim, would have paid out all appropriately claimed coverages in full.

The facts clearly show that State Farm failed to pay out all coverages properly available to the Grants.[3] Upon a rigorous and thorough review of the claim[4], State Farm elected to significantly devalue some coverages and outright deny other coverages instead of electing to pay the claim in full properly or issuing a denial. State Farm had no good reason to withhold coverages for personal

---

[3] An inference could be drawn here that State Farm intentionally chose to cease the payment of any further claims to the Grants because it was more convenient to withhold further payments on their claim until after the related criminal matter is decided than to fulfill its obligation to promptly pay out all of the Grants coverages and possibly seek reimbursement in the event of a potential guilty verdict.

[4] Plaintiffs agree that the Defendant did not act in bad faith during the process of its investigation; rather, Plaintiffs find that Defendant's bad faith arose during the post-investigation adjudication of the claim.

property and debris removal, and its undervaluation of loss of income and extra expenses was particularly unreasonable.

The unreasonable withholding of payments of a claim on the part of the insurer toward the insured in the absence of honest, intelligent action or consideration of its insured's claim is bad faith as a matter of law. See *Great Lakes Beverages, LLC v. Wochinski*, 2017 WI App 13, ¶ 14, 373 Wis. 2d 649, 659, 892 N.W.2d 333, 338.

## IV. State Farm had a Duty to Inform the Grants of Changed Policy Limits as a Matter of Law

The Grant's agree with State Farm that the applicable elements for a negligence claim are the four elements found in *Avery v. Diedrich*, 2007 WI 80, ¶ 20, 301 Wis. 2d 693, 734 N.W.2d 159. "(1) a duty on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Id*. The Grants also agree that all four elements must be met in order to succeed on a negligence claim.

State Farm cites to *Avery v. Diederich* in its claim that Wisconsin Courts have determined that only the insurance agent and not the insurance carrier has a duty to advise the insured regarding their policy limits. *Id*. The Grants disagree with State Farm's analysis of *Avery,* as a plain reading of the opinion simply states that there are certain circumstances in which an insurance agent may have a heightened duty to the insured. *Avery* never discusses any duties an

insurance carrier holds to the insured, and it certainly does not suggest that there are no such duties. Rather, the duties of the agent is imputed on the insurance carrier through the doctrine of *Respondent Superior*. *Kettner v. Wausau Ins. Companies*, 191 Wis. 2d 723, 731, 530 N.W.2d 399, 402 (Ct. App. 1995) (citing *Arsand v. Franklin*, 83 Wis.2d 40, 45–46, 264 N.W.2d 579, 582 (1978)).

Furthermore, none of State Farms referenced cases discuss an insurance carrier's duty to inform the insured of coverages in their existing policies, and any changes made thereto. Instead, they only discuss situations where increased or alternate coverages were available to the insured at the time of policy negotiation, yet the carrier and agent failed to disclose the existence of those available coverages. Wis. Stat. 631.36(5)(a)(1) provides very clear terms for the insurance carriers obligations to the insured when renewing a policy with altered terms:

> [I]f the insurer offers or purports to renew the policy but on less favorable terms or at higher premiums, the new terms or premiums take effect on the renewal date if the insurer sent by 1st class mail or delivered to the policyholder notice of the new terms or premiums [. . .] The notice shall include a statement of the policyholder's right to cancel. [. . .] If the insurer does not notify the policyholder of the new premiums or terms as required by this subsection prior to the renewal date, the insurer shall continue the policy for an additional

period of time equivalent to the expiring term and at the same premiums and terms of the expiring policy . . .

In the instant case, the facts show that Kevin had been shopping for increased insurance coverage through alternate carriers and sought similar coverage from his State Farm agent, Chris Lemay. During Kevin's deposition, he was specifically discussing the increase in his Coverage A limits after his policy change, and the record shows that it was these limits, and not the Coverage B limits, that he testified he was familiar with in the fall of 2018:

> Q. So, after Mr. LaMay let you know you could get increased building coverage, does it appear by this document that your coverage was increased?
> A. It was increased to the 558.
> Q. Did you review this document when you received it?
> A. Yes.
> Q. So it's fair to say that you knew your policy limits in October, or November, fall of 2018?
> A. That's fair to say.

(Def.'s Ex. 1 at 128:11-21)

At no point in Kevin's conversation with his agent were Coverage B limits discussed, nor did Kevin have any reason to believe they would differ from his former policy. Furthermore, none of the evidence shows that State Farm issued a notice of his new terms and his right to cancel the policy. These facts, in combination with the confusing and contradictory declaration page the Grants received, show that State Farm had a duty to notify the Grants of the full extent

of their changed policy terms, not just the increase to Coverage A, and failed that duty. (See Section II, Supra).

## **CONCLUSION**

For the foregoing reasons, Kevin J. Grant and Dayna J. Grant hereby request that the Court deny State Farm Fire and Casualty Company's Motion for Summary Judgment on all of Plaintiffs' claims, including their claims for breach of contract, bad faith, and negligence.

Dated: December 1, 2021

By: _____
Michael J. Anderson
SBN 1030840
manderson@mjalegal.com
Hayley M. Hetherington
SBN 1112897
hhetherington@mjalegal.com
MJA LAW LLC
2886 South Syene Road
Madison, WI 53711
(608)-298-7817

Attorneys for the Plaintiffs Kevin J. Grant and Dayna J. Grant