UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

| | |
|---|---|
| Kevin J. Grant and Dayna J. Grant,<br><br>Plaintiffs,<br><br>v.<br><br>State Farm Fire and Casualty Company,<br><br>Defendant. | Case No. 3:21-cv-00055-wmc<br><br>**STATE FARM FIRE AND CASUALTY COMPANIES' REPLY PROPOSED FINDINGS OF FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

---

Defendant State Farm Fire and Casualty Company ("State Farm") submits the following Proposed Findings of Fact in support of its Motion for Summary Judgment.

## PROPOSED FINDINGS OF FACT

1. On December 29, 2018, Plaintiffs Kevin and Dayna Grant (collectively the "Grants") owned real property located at 105 River Street, Woodville, Wisconsin (the "Property"). (Declaration of Emily R. Weber (hereinafter "Weber Decl."), ¶ 3, Ex. 1 at 90:10-91:5 and *id.*, ¶ 4, Ex. 2 at 33:14-25).

**Plaintiffs' Response:** Undisputed.

2. On December 29, 2018, the Grants insured the Property with State Farm Fire and Casualty Company. (Declaration of Victor Trucco (hereinafter "Trucco Decl."), ¶ 4).

**Plaintiffs' Response:** Undisputed.

3. Portions of the policy covering the property on December 29, 2018 that are relevant to this matter are as follows:

### SECTION I – PROPERTY

**Coverage B – Business Personal Property**

Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle within 100 feet of the described premises, including:

1. Property, used in your business, that you own, lease from others or rent from others, or that is loaned to you; …

(Trucco Decl. ¶ 4, Ex. A, at pg. 42).

**SECTION I – EXTENSIONS OF COVERAGE**

Subject to the terms and conditions applicable to **SECTION I** of this coverage form, the following Extensions Of Coverage apply separately to each premises described in the Declarations. But the amount of insurance provided on any one described premises will not be more than the Limit Of Insurance specified in each Extension Of Coverage if a limit is included in the extension.

**1.**   **Debris Removal**

    **a.**   Subject to Paragraphs **c**. and **d.**, we will pay your expense to remove debris of Covered Property caused by a Covered Cause Of Loss that occurs during the policy period.

        If a covered building or structure is damaged by one or more broken or fallen trees, in any one occurrence, we will pay up to $500 for the removal of tree debris from each described premises.

        The expenses will be paid only if they are reported to us in writing within 180 days of the date of accidental direct physical loss.

    **b**.   Debris Removal does not apply to costs to:

        **(1)**   Extract "pollutants" from land or water; or

        **(2)**   Remove, restore or replace polluted land or water.

    **c**.   Subject to the exceptions in Paragraph d. the following provisions apply:

        **(1)**   The most that we will pay for the total of accidental direct physical loss plus debris removal expense is

>   > the Limit Of Insurance applicable to the Covered Property that has sustained loss.
>   >
>   > **(2)** Subject to Paragraph **(1)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for accidental direct physical loss to the Covered Property that has sustained loss.
>
>   **d**. We will pay up to an additional $10,000 for debris removal expense, for each described premises, in any one occurrence of accidental direct physical loss to Covered Property, if one or both of the following circumstances apply:
>
>   > **(1)** The total of the actual debris removal expense plus the amount we pay for accidental direct physical loss exceeds the Limit Of Insurance on the Covered Property that has sustained loss.
>   >
>   > **(2)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for accidental direct physical loss to the Covered Property that has sustained loss.
>
>   Therefore, if Paragraphs **d.(1)** and/or **d.(2)** apply, our total payment for accidental direct physical loss and debris removal expense may reach but will never exceed the Limit Of Insurance on the Covered Property that has sustained loss, plus $10,000.

(Trucco Decl. ¶ 4, Ex. A at pgs. 47-48).

**FE-8739 INLAND MARINE CONDITIONS**

**5.**   **Duties in the Event of Loss.** You must see that the following are done in the event of loss to covered property:

   a.   Notify the police if a law may have been broken;

   b.   Give us prompt notice of the loss. Include a description of the lost or damaged property in the notice;

   c.   As soon as possible, give us a description of how, when and where the loss occurred;

3

    d.    Take all reasonable steps to protect the covered property from further damage by an insured loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your emergency and temporary repair expenses for consideration in the settlement of the claim. This will not increase the limit of insurance;

    e.    At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed;

    f.    Permit us to inspect the property and records proving the loss;

    g.    If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed;

    h.    Cooperate with us in the investigation or settlement of the claim;

    i.    Resume all or part of your business activities at the described premises as quickly as possible.

(Trucco Decl. ¶ 4, Ex A. at pgs. 23-24).

**CMP-4705 LOSS OF INCOME AND EXTRA EXPENSE**

**COVERAGES**

**1.    Loss of Income**

    a.    We will pay for the actual "Loss of Income" you sustain due to the necessary "suspension" of your "operations" during the period of restoration". The "suspension" must be caused by accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause of Loss. With respect to loss to personal property in the open or personal property in the vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

          With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the

4

        described premises are located, then the described premises means:

        **(1)** The portion of the building which you rent, lease or occupy; and

        **(2)** Any area within the building or on the site at which the described premises are located, if that area is the only such area that:

        **(a)** Services; or

        **(b)** Is used to gain access to;

        the described premises.

**b.** We will only pay for "Loss of Income" that you sustain during the "period of restoration" that occurs after the date of accidental direct physical loss and within the number of consecutive months for Loss Of Income and Extra Expense shown in the Declarations. We will only pay for "ordinary payroll expenses" for 90 days following the date of accidental direct physical loss.

**2.** Extra Expense

**a.** We will pay necessary "Extra Expense" you incur during the "period of restoration" that you would not have incurred if there had been no accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause Of Loss. With respect to loss to personal property in open or personal property in a vehicle, the described premises included the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, then the described premises means:

        **(1)** The portion of the building which you rent, lease or occupy; and

        **(2)** Any area within the building or on the site at which the described premises are located, if that area is the only area that:

        **(a)**    Services; or

        **(b)**    Is used to gain access to:

the described premises.

**b.**    We will only pay for "Extra Expense" that occurs after the date of the accidental direct physical loss and within the number of consecutive months for Loss Of Income And Extra Expense shown in the Declarations.

**DEFINITIONS**

**1.**    "Extra Expense" means expenses incurred:

    **a.**    To avoid or minimize the "suspension" of business and to continue "operations":

        **(1)** At the described premises; or

        **(2)** At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

    **b.**    To minimize the "suspension" of business if you cannot continue "operations".

    **c.**    To:

        **(1)** Repair or replace any property; or

        **(2)** Research, replace or restore the lost information on damaged "valuable papers and records"

to the extent it reduces the amount of loss that otherwise would have been payable under this coverage or "Loss of Income" coverage.

**2.**    "Loss of Income" means:

    **a.**    Net Income (net profit or loss before income taxes) that would have been earned or incurred if no accidental direct physical loss had occurred, including:

>> **(1)** "Rental value";
>
>> **(2)** "Maintenance fees", if you are a condominium association or other similar community association;
>
>> **(3)** Total receipts and contributions (less operating expenses) normally received during the period of disruption of operations; and
>
>> **(4)** Tuition and fees from students, including fees from room, board, laboratories and other similar sources.
>
>> Net Income does not include any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and
>
> **b.** Continuing normal operating expenses incurred, including "ordinary payroll expenses".

(Trucco Decl., ¶ 4, Ex. A, pgs. 16-18).

**Plaintiffs' Response:** Undisputed.

4. On December 29, 2018, the policy had limits of $568,044.00 for Coverage A – Building. (Trucco Decl, ¶ 6).

**Plaintiffs' Response:** Undisputed.

5. On December 29, 2018, the policy had limits of $10,968.00 for Coverage B – Business Personal Property. (Trucco Decl., ¶ 7).

**Plaintiffs' Response:** Disputed. On December 29, 2018, the policy had ambiguous limits in the amount of at least $110,968.00 for Coverage B – Business Personal Property. (Def's Ex. A. pp. 2,4).

**Defendant's Response:** Disputed. The policy had limits of $10,968.00 for Coverage B – Business Personal Property and $100,000 limits for Newly Acquired Business

7

Personal Property. (Trucco Decl., ¶ 4, Ex. A pgs. 2, 4). The Newly Acquired Business Personal Property limits apply to the Newly Acquired Business Personal Property Extension of Coverage:

> **12. Newly Acquired Or Constructed Property**
>
> **b. Business Personal Property**
> If this coverage form covers Business Personal Property, you may extend that insurance to apply to Business Personal Property:
>
> (1) Including such property that you newly acquire, at any premises you acquire; or
>
> (2) Including such property that you newly acquire, located at your newly constructed or acquired buildings at the described premises.
>
> This Extension Of Coverage does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

(Trucco Decl. ¶ 4, Ex. A, pg. 51).

6. On December 29, 2018 the Property sustained damage from a fire (the "Fire"). (ECF 1-2).

**Plaintiffs' Response:** Undisputed.

7. The responding firefighters reported that the doors to the building were locked and that they had to force entry into the building. (Weber Decl. ¶ 5, Ex. 3).

**Plaintiffs' Response:** Undisputed, but immaterial.

8. The responding firefighters also reported the smell of gasoline in the building. (*Id.*)

**Plaintiffs' Response:** Undisputed, but immaterial.

8

9. The Grants submitted a claim to State Farm for the loss. (Trucco Decl. ¶ 5).

**Plaintiffs' Response:** Undisputed.

10. State Farm retained Whitemore Fire Consultants, Inc. ("Whitemore") to investigate the Fire. (Trucco Decl. ¶ 8).

**Plaintiffs' Response:** Undisputed.

11. As a part of their investigation, Whitemore collected evidence samples from the building. (Trucco Decl. ¶ 9, Ex. B)

**Plaintiffs' Response:** Undisputed, but immaterial.

12. Armstrong Forensic Laboratory, Inc. ("Armstrong") tested the samples for ignitable liquids. (Trucco Decl. ¶ 10).

**Plaintiffs' Response:** Undisputed, but immaterial.

13. Armstrong issued their report on January 14, 2019. (Trucco Decl. ¶ 11)

**Plaintiffs' Response:** Undisputed.

14. Both samples collected during Whitemore's investigation tested positive for gasoline. (Trucco Decl. ¶ 11, Ex. C).

**Plaintiffs' Response:** Undisputed, but immaterial.

15. State Farm took recorded statements of Kevin and Dayna Grant on January 18, 2019. (Trucco Decl. ¶ 12).

**Plaintiffs' Response:** Undisputed.

16. Due to the suspicious circumstances surrounding the origin of the fire, State Farm continued its investigation into the claim under a Reservation of Rights letter dated January 29, 2019. (Trucco Decl. ¶ 13).

**Plaintiffs' Response:** Disputed in part, undisputed in part. Plaintiffs admit that State Farm sent a Reservation of Rights letter dated January 29, 2019, in order to continue its investigation of their claim, but State Farm does not provide any evidence supporting the reasoning behind the continued investigation at that time of issuing said letter.

17. The reservation of rights letter noted it was questionable if the loss was covered under the policy because it was questionable whether the loss was accidental, it was questionable whether an insured procured the loss, and it was questionable whether an insured concealed or misrepresented any fact or circumstances relating to the insurance. (Trucco Decl. ¶ 13, Ex. D).

**Plaintiffs' Response:** Undisputed.

18. On January 28, 2019, State Farm sent the Grants a letter outlining the Grants' duties after a loss as stated in the policy and also requested multiple documents to assist State Farm's investigation of the claim. (Trucco Decl. ¶14, Ex. E).

**Plaintiffs' Response:** Undisputed.

19. On March 7, 2019, State Farm provided the Grants personal property inventory forms and requested a Sworn Proof of Loss from the Grants. (Trucco Decl. ¶ 15, Ex. F).

**Plaintiffs' Response:** Undisputed

20. On May 28, 2019, State Farm sent a letter to the Grants following up on documents State Farm had previously requested and advising the Grants that State Farm would be scheduling their Examinations Under Oath. (Trucco Decl. ¶ 16, Ex. G).

**Plaintiffs' Response:** Undisputed.

21. On May 29, 2019, State Farm paid the Grants the $2,500 policy limits for the Fire Department Service Charge. (Trucco Decl. ¶17, Ex. H).

**Plaintiffs' Response:** Undisputed.

22. On February 13, 2020, the Grants had not yet submitted to Examinations Under Oath. Due to their failure to submit to Examinations Under Oath, State Farm provided an updated Reservation or Rights letter adding it was questionable whether the Grants had complied with the Duties in the Event of Loss because they had not submitted to Examinations Under Oath. (Trucco Decl. ¶ 18, Ex. I).

**Plaintiffs' Response:** Undisputed.

23. The Grants submitted to Examinations Under Oath on March 18, 2020. (Trucco Decl. ¶ 19).

**Plaintiffs' Response:** Undisputed.

24. On August 26, 2020, State Farm notified the Grants that they had requested their credit report in continuation of its investigation of the claim. (Trucco Decl. ¶ 20, Ex. J).

**Plaintiffs' Response:** Undisputed.

25. On September 8, 2020, State Farm requested additional information from the Grants to aid in the investigation of their loss of income claim. (Trucco Decl. ¶ 21, Ex. K).

**Plaintiffs' Response:** Undisputed.

26. On September 14, 2020, State Farm followed up with the Grants via letter regarding documents previously requested by State Farm but that had not yet been provided by the Grants. (Trucco Decl. ¶ 22, Ex. L).

**Plaintiffs' Response:** Undisputed.

27. On October 2, 2020, State Farm paid the Grants the Coverage A – Building policy limits of $568,044.00. (Trucco Decl. ¶ 23, Ex. M).

**Plaintiffs' Response:** Undisputed.

28. State Farm calculated the Grants' loss of income for twelve months to be $390.67. (Trucco Decl. ¶ 24, Ex. N).

**Plaintiffs' Response:** Undisputed.

29. On October 8, 2020, State Farm paid the Grants $390.67 for loss of income. (Trucco Decl. ¶ 25, Ex. O).

**Plaintiffs' Response:** Undisputed.

30. On November 5, 2020, State Farm paid the Grants $14,792.03 for Coverage B. (Trucco Decl. ¶ 26, Ex. P).

**Plaintiffs' Response:** Undisputed.

31. The Grants commenced this action against State Farm on December 23, 2020 for three causes of action: (1) breach of contract, (2) bad faith, and (3) negligence. (ECF 1-2).

**Plaintiffs' Response:** Undisputed.

32. On July 9, 2021, the State of Wisconsin filed a Criminal Complaint and Warrant against Kevin Grant in relation to the Fire, including charges for Arson of a Building with Intent to Defraud and seven counts of Second Degree Recklessly Endangering Safety. (Weber Decl. ¶ 6, Ex. 4).

**Plaintiffs' Response:** Undisputed, but immaterial.

33. The Criminal Complaint and Warrant alleges that Kevin Grant "on or about Saturday, December 29, 2018, in the Village of Woodville, St. Croix County, Wisconsin, by means of fire, did intentionally damage a building with intent to defraud an insurer of the building…" (*Id.*)

**Plaintiffs' Response:** Undisputed, but immaterial.

34. Kevin Grant is set to be arraigned on these charges on December 1, 2021. (Weber Decl. ¶ 7, Ex. 5).

**Plaintiffs' Response:** Undisputed.

**Defendant's Response:** Kevin Grant was arraigned on these charges on December 1, 2021. (Weber Supp. Aff., ¶ 4, Ex. 8) (Revision due to the timing of response and keeping the facts accurate, however, the change is immaterial).

35. The Grants allege that State Farm breached the contract because:

   a. "The relevant policy with State Farm contained a clause for debris removal coverage that State Farm has not paid";

   b. "The relevant policy with State Farm contains a clause which provides coverage for the interruption of income. State Farm has grossly miscalculated this coverage";

   c. "[The Grants'] original State Farm policy contained $150,000 coverage for personal property damage, and State Farm has paid $14,792.03..."; and

   d. "State Farm gave no consideration to the losses in Dayna's hair salon."

(Weber Decl. ¶ 8, Ex. 6, pg. 3, Answer 4).

**Plaintiffs' Response:** Undisputed.

36. Plaintiffs are claiming State Farm owes them additional sums under the contract including $135,207.97 in personal property coverage; $179,000 in debris removal coverage; $9,725 for hair salon inventory damage; $8,200 for the cost of renting an alternate facility; and $28,700 for interruption of income. (Weber Decl. ¶ 8, Ex. 6, pgs. 3-4, Answer 6).

**Plaintiffs' Response:** Undisputed.

37. On October 13, 2021, counsel for State Farm attempted to take the deposition of Kevin Grant. (*See* Weber Decl. ¶ 3, Ex. 1).

**Plaintiffs' Response:** Disputed. On October 13, 2021, counsel for State Farm did take the deposition of Kevin Grant (*See* Weber Decl. ¶ 3, Ex. 1).

38. During his deposition, Kevin Grant invoked his Fifth Amendment privilege against self-incrimination 130 times including to all questions related to their insurance claim, the Fire, and all questions related to this action. (*See generally*, Weber Decl. ¶ 3, Ex. 1, 129:5-159:22).

**Plaintiffs' Response:** Undisputed in part, disputed in part. Kevin Grant did invoke his Fifth Amendment privilege 130 times during his deposition but did not do so for "all questions related to their insurance claim, the Fire, and all questions related to this action. (See generally, Weber Decl. ¶ 3, Ex. 1).

39. On October 18, 2021, counsel for State Farm attempted to take the deposition of Dayna Grant. (*See* Weber Decl. ¶ 4, Ex. 2).

**Plaintiffs' Response:** Disputed. On October 18, 2021, counsel for State Farm did take the deposition of Dayna Grant. (*See* Weber Decl. ¶ 4, Ex. 2).

40. During her deposition, Dayna grant invoked her Fifth Amendment privilege against self-incrimination 125 times including to all questions related to their insurance claim, the fire, as well as all questions related to this action. (*See generally*, Weber Decl. ¶ 4, Ex. 2).

**Plaintiffs' Response:** Undisputed in part, disputed in part. Dayna Grant did invoke her Fifth Amendment privilege 125 times during his [sic] deposition but did not do so for "all questions related to their insurance claim, the Fire, and all questions related to this action." (See generally, Weber Decl. ¶ 4, Ex. 2).

41. Kevin Grant invoked his Fifth Amendment privilege against self-incrimination when asked about the current condition of the Property, whether any demolition had been done at the Property, whether any debris removal had been done at the Property, and whether he has incurred $179,000 costs for the same. (Weber Decl. ¶ 3, Ex. 1 at 148:12-150:9).

**Plaintiffs' Response:** Undisputed

42. Dayna Grant invoked her Fifth Amendment privilege against self-incrimination when asked whether any demolition had been done at the Property, whether any debris removal had been done at the Property, and whether the Grants had incurred $179,000 for the same. (Weber Decl. ¶ 4, Ex. 2 at 72:2-20 and 73:4-19).

**Plaintiffs' Response:** Undisputed

43. Kevin Grant invoked his Fifth Amendment privilege against self-incrimination when asked how the alleged loss of income was calculated and if he had any documents supporting loss of income related to the fire. (Weber Decl. ¶ 3, Ex. 1 at 152:3-11).

**Plaintiffs' Response:** Undisputed

44. Dayna Grant invoked her Fifth Amendment privilege against self-incrimination when asked if she had lost $28,700 in income since the Fire, if this alleged loss of income was due to the Fire, and how this number was calculated. (Weber Decl. ¶ 4, Ex. 2 at 74:13-75:10).

**Plaintiffs' Response:** Undisputed

45. Kevin Grant invoked his Fifth Amendment privilege against self-incrimination when asked whether he incurred $8,200 for the cost of renting an alternate facility, and if so, when and who this amount was paid to. (Weber Decl. ¶ 3, Ex. 1 at 151:7-21).

**Plaintiffs' Response:** Undisputed

46. Dayna Grant invoked her Fifth Amendment privilege against self-incrimination when asked if she had paid $8,200 for the cost of renting an alternate facility. (Weber Decl. ¶ 4, Ex. 2 at 73:21-74:11).

**Plaintiffs' Response:** Undisputed

47. The Grants claim State Farm was "negligent regarding the subject insurance policy, including as to the determination, formulation, and inclusion of coverages and limits set forth therein and as to the issuance and continuation thereof." (ECF 1-2, at ¶ 14).

**Plaintiffs' Response:** Undisputed

48. The Grants further allege State Farm was negligent because "State Farm never contacted [the Grants] to conduct a policy review." (Weber Decl. ¶ 7, Ex. 5, pg. 5).

**Plaintiffs' Response:** Undisputed

49. In midyear of 2018, Kevin Grant was shopping around for insurance policies. He found that other insurers would insure the property at a much higher value. State Farm would not insure the property at the same limits as other insurers. Kevin Grant ultimately decided to stay with State Farm for a policy limit increase without a change in premium. (Weber Decl. ¶ 3, Ex. 1 at 126:9-23).

**Plaintiffs' Response:** Undisputed

50. Kevin Grant was aware of the policy limits in fall of 2018. (Weber Decl. ¶ 3, Ex. 1 at 128:19-21).

**Plaintiffs' Response:** Disputed in part, undisputed in part. Plaintiffs do not dispute that Kevin Grant was aware of the policy limits for Coverage A in the fall of 2018, but dispute that Kevin Grant was aware of the changes to the policy limits for Coverage B for the policy in fall of 2018. (Weber Decl. ¶ 3, Ex. 1 at 128:19-21).

**Defendant's Response:** Kevin Grant testified that he reviewed the declarations when he received them and was aware of the policy limits in fall of 2018. (Weber Decl. ¶ 3, Ex. 1 at 128:16-21).

Dated: December 13, 2021	**HAWS-KM, P.A.**

*/s/ Emily R. Weber*
C. Todd Koebele #17287X
Emily R. Weber #1122477
30 East Seventh Street, Suite 3200
St. Paul, MN 55101-4919
Telephone: (651) 227-9411
Fax: (651) 223-5199
tkoebele@hkmlawgroup.com
eweber@hkmlawgroup.com

Attorneys for Defendant State Farm Fire and Casualty Company

4872-0736-5638, v. 1